1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF OREGON

11                    PORTLAND DIVISION

12  VINCENT PADGETT,                    )
                                        )
13                  Plaintiff,          )
                                        )
14       v.                             )
                                        )    No.  CV-08-87-HU
15  ANTON KOWANDA; CHRIS SCHAEFER,)
    SCOTT WILLIS; MICHELLE           )
16  HUBBARD; JUREK KOLMAN; NANCY   )
    HOWTON; TROY BROWSWER; DARYL    )
17  BORELLO; RICHARD OGDEN; CARLA )    FINDINGS & RECOMMENDATION
    TUPOU; ROBIN WILKERSON; and    )
18  GEORGE DEGNER, M.D.,             )
                                        )
19                  Defendants.        )
    ───────────────────────────────)

20

21  John C. Rothermich
    Jeffrey C. Young
22  GARVEY SCHUBERT BARER
    121 S.W. Morrison Street, Eleventh Floor
23  Portland, Oregon 97204-3141

24       Attorneys for Plaintiff

25  / / /

26  / / /

27  / / /

28  / / /

1 - FINDINGS & RECOMMENDATION

1  John R. Kroger
   ATTORNEY GENERAL
2  Billie J. Eidson
   ASSISTANT ATTORNEY GENERAL
3  Department of Justice
   1162 Court Street NE
4  Salem, Oregon 97301-4096

5      Attorneys for Defendants

6  HUBEL, Magistrate Judge:

7      Plaintiff Vincent Padgett brings this 42 U.S.C. § 1983 action

8  against several employees of the Oregon Department of Corrections

9  (ODOC), alleging that defendants failed to protect him from an

10 assault, and then failed to provide constitutionally adequate

11 medical care for an injury he alleges he sustained in the assault.

12     Defendants move for summary judgment on both claims. I

13 recommend that the motion be denied.

14                          BACKGROUND

15     Plaintiff is currently incarcerated at the Snake River

16 Correctional Institution. At the time the relevant events took

17 place, in the spring of 2006 through the spring and summer of 2007,

18 plaintiff was housed at the Oregon State Correctional Institution

19 (OSCI) and then at the Oregon State Penitentiary (OSP).

20     As of May 2006, plaintiff was employed at OSCI with the

21 Engineering Support Unit (ESU) of Oregon Correctional Enterprises

22 (OCE). While there, he was supervised by defendant Jurek Kolman,

23 and then did special work on marketing for defendant Chris

24 Schaefer. Schaefer valued plaintiff's work. E.g., Exh. Q to

25 Rothermich Decl. (July 6, 2006 letter from Schaefer stating that

26 plaintiff had done "more for the shop in marketing assistance" than

27 "all others combined.").

28     On May 2, 2006, plaintiff and another inmate named Jim Jones,

2 - FINDINGS & RECOMMENDATION

informed prison officials, including Schaefer, that inmate Shawn McWeeny had schemed to load a video game onto the inmate computer network so that McWeeny and inmate William Steiner could play the game. Plaintiff was concerned that Steiner suspected that plaintiff was the one who informed prison officials. Plaintiff believed he was "targeted for assault."

Schaefer told defendant Tony Kowanda, "our IT guy[,]" about the issue and asked him to check into it. Kowanda stated in deposition that Schaefer called him and told him that inmates had reported that McWeeny had put a game on the system. Kowanda Depo. at pp. 53-54. Kowanda denied that Schaefer had named specific inmates. Id. Schaefer, however, states that he told Kowanda that plaintiff and Jones "visited with" Schaefer about the issue. Schaefer Depo. at p. 42.

Plaintiff observed Kowanda take Steiner into the ESU manager's office on May 3, 2005, where plaintiff observed, through the window of that office, the two of them having a conversation. Pltf's Declr. at ¶ 3. On May 17, 2006, plaintiff observed Steiner and Kowanda having another conversation in the ESU Manager's office. Id. at ¶ 4. Kowanda, although stating that he could not actually remember, conceded that it was possible that he pulled Steiner aside and told Steiner that he (Kowanda) was looking into the possibility of inmates having access to a video game. Kowanda Depo. at p. 82.

In an August 2006 report of an investigation into the incident prepared by defendant Daryl Borello, Borello wrote that during his June 6, 2006 interview with Kowanda, "Kowanda said he did speak to Inmate Steiner about the possibility of a video game being

3 - FINDINGS & RECOMMENDATION

accessible to the inmates" but that Kowanda denied mentioning plaintiff's name to Steiner.  Exh. R to Rothermich Declr. at p. 6. Borello also noted that Kowanda said that Steiner had given Kowanda information in the past and had cooperated with previous investigations conducted by Kowanda.  Id.

According to plaintiff, Jones reported to plaintiff that immediately after Steiner emerged from the ESU office on May 17, 2006, Steiner approached Jones and McWeeny and told them that plaintiff had been identified as the person who "ratted them out." Pltf's Declr. at ¶ 4.

Sometime between May 11, 2006, and May 16, 2006, plaintiff sent a letter to his mother, Pamela Eller, describing the incident with the video game.  Attchmt 4 to Eidson Declr. at p. 19.  There, he states that Kowanda had actually given the video game to the inmates himself when he was a supervisor there.  Id.  Plaintiff states that "[e]very individual in that shop knows they are playing video games and that Kowanda and [defendant Officer Michelle] Hubbard are covering for them."  Id.  Plaintiff offers to take a polygraph if "assurances are in place that this won't get swept under the rug, leaving me exposed to harm by security staff and inmates."  Id.

On May 16, 2006, Eller sent a copy of the letter, along with her own letter, to "Public Affairs" at the ODOC.  Attchmt. 4 to Eidson Declr. at p. 18.  She notes that the author of the attached letter wants to remain anonymous, but is concerned for his safety. Id.  She requested "immediate action."  Id.  She sent the same letter to Max Williams, ODOC's Director.

Immediately after Jones told plaintiff that Steiner had told

4 - FINDINGS & RECOMMENDATION

1    Jones and McWeeny that plaintiff had been identified as the "rat,"
2    plaintiff told Schaefer about this.  Pltf's Declr. at ¶ 4.  The
3    next day, pursuant to instructions he had received from Schaefer,
4    plaintiff wrote a memo to Schaefer describing the events of May 17,
5    2006, and further disclosing that it was generally known by ESU
6    inmate-employees that Kowanda had given the video game disc to
7    Steiner when Kowanda was working in the ESU.  Id. at ¶ 5; Exh. A to
8    Pltf's Declr. (May 18, 2006 memo from plaintiff to Schaefer).

9        On May 22, 2006, Assistant Chief Investigator Alan Scharn
10   requested that defendant Daryl Borello investigate allegations that
11   inmates  and  ODOC  staff  had  threatened  plaintiff,  as  well  as
12   allegations that ODOC staff had allowed inmates to play a computer
13   game.  Borello Declr. at ¶ 4; Exh. R to Rothermich Declr. (Aug. 14,
14   2006 Investigative Report by Borello).

15       On that same day, Jones told plaintiff that Steiner told him
16   that Steiner had been reprimanded for spreading information given
17   to him by staff.  Pltf's Declr. at ¶ 6.  Plaintiff again approached
18   Schaefer to report what plaintiff considered further inappropriate
19   communications by staff to Steiner.  Id.  Schaefer again directed
20   plaintiff to memorialize the events in a memo, which plaintiff
21   drafted on May 23, 2006.  Id.

22       In the May 23, 2006 memo to Schaefer, plaintiff expressed fear
23   of being assaulted.  Exh. B to Pltf's Declr.  He also told Schaefer
24   about Steiner's involvement with gambling, drugs, and cigarette
25   smuggling within the facility.  Exh. B to Pltf's Declr.

26       On  June  1,  2006,  Borello  and  defendant  Richard  Ogden,
27   Operations Captain at OSCI at the time, met with plaintiff.  In his
28   declaration, Borello states that in the June 1, 2006 meeting,

5 - FINDINGS & RECOMMENDATION

1   plaintiff told Borello that he was not concerned for his safety and
2   that things had "really cooled off."    Borello Declr. at ¶ 6.
3   Borello asked plaintiff if plaintiff was being threatened by staff
4   or employees and plaintiff told Borello he was not.    Id.    Borello
5   states that plaintiff told him that plaintiff felt safe at OSCI and
6   he did not feel that he would be safer at a different institution.
7   Id.    Borello felt that plaintiff had "significantly exaggerated"
8   perceived threats.    Id. at ¶ 7.    Before concluding the interview,
9   Borello states he gave plaintiff a final opportunity to tell
10  Borello if he did not feel safe, had been threatened, or would feel
11  safer at a different institution.    Id. at ¶ 8.    Borello reports
12  that plaintiff stated that he felt fine at OSCI and was not being
13  threatened or extorted in any way.    Id.

14       Ogden states that in the meeting with plaintiff and Borello,
15  plaintiff said he was "going to go out into the recreation yard and
16  talk to the guy who wanted to assault him and talk him out of it."
17  Ogden Declr. at ¶ 4.

18       Plaintiff denies that he informed Ogden and Borello that he
19  was not concerned for his safety.    He notes that his memos of May
20  18, 2006, and May 23, 2006, reflect his express concerns for his
21  safety.    Plaintiff admits he told Borello and Ogden that he wanted
22  to stay at OSCI and keep his job with OCE.    Pltf's Declr. at ¶ 7.
23  Additionally, plaintiff, Borello, and Ogden agreed to a plan which
24  appears to address safety concerns.    The plan involved (1) cutting
25  down the number of complaints plaintiff and his mother made to
26  limit plaintiff's exposure; (2) eliminating ODOC staff
27  conversations with other inmates regarding a video game
28  investigation that was completed, since plaintiff felt he had been

6 - FINDINGS & RECOMMENDATION

1    identified as a "rat" in that investigation; and (3) plaintiff
2    communicating all future concerns directly to Ogden via a "kyte"
3    since plaintiff felt that the staff was involved in a conspiracy
4    against him.  Ogden Declr. at ¶ 4.  Plaintiff states that Borello
5    and Ogden explained that he needed to communicate "all future
6    concerns" to Ogden through trusted prison staff because Borello and
7    Ogden could not ensure that plaintiff's communications could be
8    kept confidential from Kowanda and Steiner if plaintiff or his
9    mother complained of the risks to plaintiff's safety through other
10   avenues.  Pltf's Declr. at ¶ 8.

11       Plaintiff further states that Ogden and Borello asked
12   plaintiff to provide additional information concerning Steiner's
13   tobacco smuggling.  Id.  He states that due to their assurances
14   that his role in providing information would be kept confidential,
15   he gave them information about this issue and specifically told
16   them that he knew Steiner was smuggling tobacco into OSCI and had
17   at least once hidden tobacco in the ESU.  Id.

18       Plaintiff agreed to contact Ogden if he heard more about
19   Steiner's activities.  On June 5, 2006, he sent a kyte to Ogden
20   telling Ogden that he had more information regarding the tobacco
21   issue because someone had given plaintiff more details.  Exh. C to
22   Pltf's Declr.  He gave specific details about how the tobacco was
23   getting into the prison and who was involved.  Id.

24       On June 8, 2006, defendants Carla Tupou and Scott Willis
25   warned Steiner that he would lose his job at OCE and be transferred
26   out of OSCI if he were implicated in misconduct.  At the time,
27   Tupou worked in "transition programming" at OSCI.  Tupou Declr. at
28   ¶ 1.  She knew Steiner and had a "history with him" and told him he

7 - FINDINGS & RECOMMENDATION

1  would be moved if he were involved in the misconduct in any way.
2  Tupou Depo. at pp. 53-54.    Tupou had previously discussed with
3  Ogden the potential for plaintiff being seen as a "rat."  Tupou
4  Depo. at p. 42.

5      On June 9, 2006, Steiner told plaintiff that Willis and Tupou
6  had, the day before, told Steiner that plaintiff was "not the rat,"
7  and had told him he would be immediately shipped out if anything
8  happened to plaintiff.  Ptlf's Declr. at ¶ 12.  Steiner threatened
9  plaintiff with assault because plaintiff was the "rat" regarding
10 the video game incident.  Id.  When plaintiff protested that
11 Steiner had no proof that plaintiff was the rat, Steiner said
12 "staff told me and that's good enough for me."  Id.  Steiner told
13 plaintiff that if Steiner was shipped out, his "buddies" from the
14 European Kindred white supremacist prison gang would "take care of
15 [plaintiff]."  Id.

16     On that same day, June 9, 2006, plaintiff drafted a several
17 page description of events, including the conversation with Steiner
18 earlier that day, and a timeline.  Exh. D to Pltf's Declr.  A stamp
19 from the Superintendent's Office shows it was received on June 12,
20 2006.  Id.

21     Also on the same date, June 9, 2006, prison officials "shook
22 down" the shop where plaintiff and Steiner worked.  Steiner was
23 found to be in possession of tobacco and was charged with an
24 infraction.

25     Plaintiff was assaulted on June 11, 2006.  Plaintiff did not
26 know his assailant.  Plaintiff was punched over the head and body
27 for several minutes.  Pltf's Declr. at ¶ 15.  Plaintiff reported
28 the assault to Superintendent Howton via a kyte dated June 11,

8 - FINDINGS & RECOMMENDATION

1   2006, the day the assault occurred.  Exh. E to Pltf's Declr.

2      At some point after the June 11, 2006 assault, Ogden met with

3   plaintiff about transferring out of OSCI.  Plaintiff said he did

4   not want to transfer out, because, as he explained at his

5   deposition, he thought it would make things look worse, that

6   running would make him look like a rat, and that anywhere he went,

7   he would be attacked.  Pltf's Depo. at p. 80 (Attchmt 3 to Eidson

8   Declr. at p. 7).  Plaintiff denies that Ogden offered to place him

9   in administrative segregation, but remembers Ogden offering a

10  "lock-up," which plaintiff understood to mean a transfer to

11  disciplinary segregation, or "the hole."  Id. at p. 82 (Attchmt 3

12  to Eidson Declr. at pp. 8-9).  Plaintiff again said that he did not

13  want that because it would make him look like he was running.  Id.

14     Plaintiff wanted to stay in the general population at OSCI

15  because, he hoped, since he had been assaulted already, if his

16  assailants saw that he did not run as a result, they may conclude

17  he was not actually a rat.  Id. at p. 83 (Attchmt 3 to Eidson

18  Declr. at p. 9).

19     On June 12, 2006, one day after the June 11, 2006 assault,

20  Jones told plaintiff that Steiner took credit for the assault and

21  had told Jones to tell plaintiff that "it could happen again."

22  Pltf's Declr. at ¶ 16.  Plaintiff immediately wrote a letter to

23  Schaefer and Willis.  Exh. F to Pltf's Declr.  There, plaintiff

24  gave information about the previous day's assault, and then gave

25  detailed information about threats that had been made to him that

26  day by inmate Mike Meehan.  Id.  Plaintiff recited additional

27  background information and noted several names of people present

28  during the threats occurring that morning.  Id.  He requested that

9 - FINDINGS & RECOMMENDATION

1   "these facts" be emailed to Tupou, Ogden, and Howton.  Id.

2        Also on June 12, 2006, plaintiff was threatened with assault

3   by several different inmates in front of prison staff.  Pltf's

4   Declr. at ¶ 18.  Over the next three weeks, he received more

5   threats from OSCI inmates who were friends or associates of

6   Steiner's.  Id. at ¶ 19.

7        Between June 9, 2006, and July 6, 2006, Schaefer sent emails

8   to Willis and Kolman explaining that he knew about Steiner's

9   threats to plaintiff, expressing his concern that plaintiff was not

10  protected, and suggesting that Steiner be transferred.  Exhs M, N.

11  Q to Rothermich Declr.; Schaefer Depo. at pp. 80, 92, 97.

12       Plaintiff was assaulted a second time on July 5, 2006.  This

13  time, he was struck from behind and immediately lost consciousness.

14  Pltf's Declr. at ¶ 19.  The same day, Steiner was found guilty of

15  possessing contraband (presumably, the tobacco discovered on June

16  9, 2006).  Steiner was transferred out of OSCI two days after the

17  July 5, 2006 assault on plaintiff.

18       On July 25, 2006, plaintiff was transferred to OSP.

19       Plaintiff went to the emergency room on July 5, 2006, after

20  the second assault.  The chart note written in plaintiff's ODOC

21  medical records before being taken to the emergency room indicates

22  that he had one or more lacerations which needed evaluation by the

23  local hospital.  Exh. K to Rothermich Declr. a p. 2.  Plaintiff was

24  treated at Santiam Memorial Hospital Emergency Department.  Exh. L

25  to Rothermich Declr.  He received stitches to his wounds, which

26  were lacerations to the lip and chin.  Id.  He was diagnosed as

27  having facial trauma, facial laceration, left lower lip laceration,

28  and a jaw contusion.  Id.  No mention is made in the emergency

10 - FINDINGS & RECOMMENDATION

department record of plaintiff having lost consciousness, or that plaintiff denied losing consciousness, but in his declaration, plaintiff states that he did lose consciousness. Pltf's Declr. at ¶ 19.  Although plaintiff complained of a headache following the first assault on June 11, 2006, there is no mention in the ODOC or Santiam Hospital Emergency Department records of a headache complaint on the date of the second assault, July 5, 2006.  Exh. K to Rothermich Declr. at pp. 1-2; Exh. L to Rothermich Declr.

In his deposition, plaintiff testified that before the first assault on June 11, 2006, he had not experienced headaches except for a very few times in his life.  Pltf's Depo. at p. 10.  After the first assault, he had a headache on the left side of his head which he described as not severe, but mild.  Id. at p. 9.  That pain continued in subsequent weeks, going away sometimes, but continuing mildly.  Id. at p. 10.  At that time, he just thought of it as unusual and a couple of weeks later thought it probably was from being hit in the head.  Id.  Still, he did not think it was serious.  Id.

However, in September 2006, the pain became "extremely serious," got "really, really bad," and wouldn't go away or back off.  Id. at p. 11.  Plaintiff was evaluated, and given an anti-inflammatory medication.  Donald Olson Declr. at ¶ 8.

On October 27, 2006, plaintiff was admitted to the Special Management Unit (SMU) at OSP for severely mentally ill inmates. Id. at p. 28.  The nursing assessment done upon his admission to SMU notes the reason for admission as suicidal ideation.  Id.  The assessment also noted plaintiff's current problems of headache and vertigo.  Id.

11 - FINDINGS & RECOMMENDATION

1    On October 29, 2006, plaintiff complained of having a headache
2    for a week. Id. at p. 3. He noted he had sensitivity to light,
3    decreased appetite, and nausea. Id. He was told to take
4    analgesics as needed. Id. On November 1, 2006, he complained of
5    continued headache and further complained that the medications he
6    had been given were ineffective. Id.; see also Id. at p. 27. He
7    was placed on the list to see an internist. Id. The SMU records
8    note several complaints of increased headache pain during this time
9    and complaints that the medications were ineffective. Id. at pp.
10   25, 32-35 (Oct. 29, 2006; Nov. 1, 2006; Nov. 2, 2006; Nov. 3, 2006;
11   Nov. 4, 2006; Nov. 5, 2006; Nov. 6, 2006); see also Id. at p. 36
12   (November 1, 2006 medication management progress note; SMU
13   psychiatrist Dr. Michael Duran indicating plaintiff's complaint of
14   bilateral headache for two weeks, which wraps around his head, with
15   constant pain and nausea). On November 5, 2006, in a SMU Treatment
16   Care Plan, Dr. Duran noted plaintiff's recent suffering of severe
17   headaches. Id. at p. 50-51.

18       Plaintiff was evaluated by defendant Dr. George Degner on
19   November 7, 2006. Id. at p. 4; Degner Depo. at pp. 47-48. Dr.
20   Degner noted plaintiff's complaint of constant headache for two and
21   one-half weeks, which started in front, but now all around, and
22   "stays bad for hours." Id. Plaintiff complained of nausea, but no
23   vomiting. Id. Dr. Degner performed a physical exam which showed
24   that plaintiff was alert and able to ambulate well. Id. He had a
25   tender occipital ridge. Id. Dr. Degner diagnosed a tension
26   headache and told plaintiff to use Orudis/ketoprofen and Tylenol
27   for pain. Id.; Degner Depo. at p. 48.

28       On November 13, 2006, plaintiff complained to SMU staff that

12 - FINDINGS & RECOMMENDATION

he was still suffering from a headache that had been bothering him for months. _Id._ at p. 42. He was scheduled to have the doctor review his medications and look into it. _Id._

He complained again on November 15, 2006. _Id._ at p. 43. On November 19, 2006, plaintiff complained again of continued headaches which, the chart note states, he believed started after his July assault. _Id._ at p. 4. He was scheduled to see the doctor "this week." _Id._ He complained again on November 23, 2006. _Id._ at p. 46.

On November 25, 2006, plaintiff apparently attempted to hang himself, and continued to complain of headaches. _Id._ at p. 4. Then, in early December 2006, plaintiff attempted to drown himself in his sink and attempted to choke himself by stuffing paper in his mouth. _Id._ at p. 56. He made another attempt to hang himself, this time in the shower, on December 7, 2006. _Id._ at p. 58.

On December 13, 2006, plaintiff complained again to SMU staff about headache. _Id._ at p. 60. On December 28, 2006, he complained again and received more medication. _Id._ at p. 61. On December 29, 2006, he complained of poor sleep because of headaches. _Id._ at p. 62. A December 22, 2006 "SMU TREATMENT PLAN PROBLEM LIST" notes that he has suffered from "severe/migraine headaches," reportedly lasting for several days. _Id._ at p. 63. On January 1, 2007, he complained again of headache pain. _Id._ at p. 65.

A January 4, 2007 chart note indicates that plaintiff continued to complain of chronic headache with no relief from pain. _Id._ at pp. 4, 66. He received ketoprofen and Tylenol. _Id._ at p. 66. A January 5, 2007 chart entry entitled "RN Weekly Note,"

13 - FINDINGS & RECOMMENDATION

states that plaintiff complained of chronic headache and has made nursing staff aware of this issue several times in the past. Id. at p. 67. The nurse added plaintiff to the doctor's list "this week" and put a note about it in the progress notes. Id.

Plaintiff was seen by Dr. Degner on January 9, 2007. Id. at p. 4; Degner Depo. at p. 56. The chart note from the visit indicates that plaintiff reported that his headache went away about ten days ago, but "comes and goes" and that he reported getting a "band-like" pain around his head. Id. Plaintiff was again diagnosed with a tension headache. Id.

On January 17, 2007, plaintiff complained of chronic headaches. Id. at p. 69. He repeated the complaint on January 19, 2007, and noted that though he had been seen by a physician for the issue several times, it had not resolved. Id. at p. 70. He complained again on January 20, 2007. Id.

In the January 20, 2007 "RN Weekly Note," the nurse noted that plaintiff reported that his headaches never fully went away and even though he had been seen, he had chronic headaches without a clear solution. Id. at p. 72. The note indicates that the nurse said she would speak to Dr. Duran and the "treatment team" about the problem. Id. On January 22, 2007, plaintiff's headache and stomach upset continued. Id. at p. 73.

In late February 2007, plaintiff was caught storing pills as a means to commit suicide. Id. at p. 74. Then, on February 27, 2007, he was found bleeding and cut up and was sent to the infirmary where his wounds were sutured. Id. at p. 76. He was given medication and put in five-point restraints. Id.

On March 8, 2007, plaintiff complained of continuing headache

14 - FINDINGS & RECOMMENDATION

for five months and poor sleep.  _Id._ at p. 77.  The "RN Weekly Note," dated March 9, 2007, remarks that plaintiff continued to complain of headaches and was put on the doctor's list for the next week.  _Id._

Another chart note dated March 10, 2007, states that plaintiff's complaint of chronic headaches had not been relieved by medication so far.  _Id._ at p. 5.  Plaintiff was currently on ketoprofen, 75 milligrams three times per day, but reported that even with regular use, it did not totally remove his pain.  _Id._ He reported trying to stop taking the medication, but his headache pain returned quickly.  _Id._  On March 13, 2007, plaintiff complained of headache pain to SMU staff.  _Id._ at p. 78.

Plaintiff was examined by Dr. Degner on March 20, 2007.  _Id._ at p. 5.  Dr. Degner again diagnosed tension headaches and renewed the medications he had previously prescribed.  _Id._

On March 28, 2007, another SMU chart note indicates that plaintiff reported that his headaches remained and increased when he was on a treadmill.  _Id._ at p. 79.

On May 6, 2007, plaintiff complained again of daily headaches.  _Id._ at p. 5.  He was placed on the physician list for evaluation.  _Id._  Plaintiff was seen by Dr. Degner on May 8, 2007, at which time he again complained of a persistent headache.  _Id._ at p. 6.  Dr. Degner noted that plaintiff reported having a great deal of pain, but Dr. Degner observed no objective evidence of any discomfort.  _Id._  Dr. Degner again diagnosed a tension headache.  _Id._

On May 11, 2007, SMU mental health staff noted that plaintiff had a headache and appeared to be in pain.  _Id._ at p. 80.  He expressed anger about doctors not taking his headache seriously.

15 - FINDINGS & RECOMMENDATION

1  <u>Id.</u>  On May 13, 2007, plaintiff reported severe headache with
2  increased intensity, preventing him from making it to the "chow
3  line" because of the intensity of the pain.  <u>Id.</u> at p. 6.  He
4  reported the pain as being a "10" on a "0 to 10" scale and stated
5  that he would rather "break a bone than have this pain." <u>Id.</u>  He
6  described it as a brain freeze.  <u>Id.</u> However, at the moment of the
7  examination, the pain was down to a "3-4."  <u>Id.</u>  The pain was
8  assessed as ranging from mild to severe, and plaintiff was placed
9  on the physician list for evaluation.  <u>Id.</u>

10      On May 14, 2007, Dr. Duran ordered Midrin, a medication used
11  for tension or migraine headaches, for plaintiff.  <u>Id.</u> at p. 17;
12  Duran Depo. at p. 75.

13      On May 16, 2007, plaintiff reported vomiting as a result of
14  increased intensity of headache pain since early May.  <u>Id.</u> at p. 7.
15  He reported the pain as a 10 with standing, a 5 with sitting, and
16  a 1 if lying down.  <u>Id.</u>  He noted the presence of nausea with the
17  pain for months.  <u>Id.</u>  He had been using ketoprofen and Tylenol
18  regularly, started Midrin 48 hours previously, and had taken eight
19  caps with only moderate results.  <u>Id.</u>  The pain went from 10 to 5
20  with Midrin.  <u>Id.</u>  He was pale and showed alteration in comfort.
21  <u>Id.</u>  His color improved during the exam.  <u>Id.</u>

22      On that same date, May 16, 2007, Dr. Duran ordered a neurology
23  consult for plaintiff.  Exh. K to Rothermich Declr. at p. 17.  Dr.
24  Duran has no idea why the neurology consult did not occur.  Duran
25  Depo. at p. 74.

26      On May 18, 2007, plaintiff reported being angry with staff for
27  not taking his headaches seriously.  Exh. K to Rothermich Declr. at
28  p. 81.  He stated that he had constant headaches, but "they keep

16 - FINDINGS & RECOMMENDATION

telling me it's just stress." Id.

On May 20, 2007, plaintiff again complained of severe head pain, describing it as a 10 and worse than breaking bones. Id. He complained of nausea and reported that the Midrin was less and less effective. Id. He expressed that the headaches were a result of his assaults. Id. He had facial grimacing and was tearful. Id. He was kept on Midrin, Tylenol, or ketoprofen, and placed on the physician list for a full evaluation. Id.

On May 21, 2007, plaintiff reported vomiting every time he stood up. Id. He was seen cellside and alteration in comfort was noted. Id. at pp. 7-8. Several hours later, but still on May 21, 2007, plaintiff was still complaining of a severe headache, nausea, and vomiting. Id. at p. 8. He stated that he had nothing left to throw up. Id. He was crying repeatedly, had facial grimaces, and a slightly flushed face. Id. Staff called Dr. Degner who, without seeing plaintiff, ordered 30 milligrams of intramuscular Toradol, which plaintiff reported effected no change. Id. He was lying in bed with severe pain. Id.

On May 22, 2007, plaintiff reported to SMU staff that the Toradol injection he received the previous evening was not effective and that he continued to vomit due to chronic severe headaches. Id. at p. 82. He was noted to have a depressed affect and an inability to stand because of the severity of the pain. Id. It was noted that plaintiff had been complaining on and off about headaches for the past two months with increasing severity. Id.

Dr. Degner examined plaintiff on May 22, 2007. Id. at p. 8. Because he was so ill, Dr. Degner examined plaintiff in his cell. Plaintiff could not sit up from the pain, and plaintiff vomited

17 - FINDINGS & RECOMMENDATION

1  several times during the exam. Id.; Degner Depo. at pp. 77-80;

2  Pltf Depo. at pp. 32-33. Dr. Degner concluded that plaintiff had

3  a history of tension headaches which were worsening lately after

4  what Dr. Degner noted was an increase in Lamictal, a psychiatric

5  medication, which could have been a causative agent for the

6  increased symptoms. Exh. K to Rothermich Depo. at p. 8; Degner

7  Depo. at pp. 78-80. According to plaintiff, Dr. Degner told

8  plaintiff that he was vomiting because he was abusing his

9  medication. Pltf Depo. at pp. 32-33. Plaintiff, however, had

10  stopped taking the Lamictal several days before the May 22, 2007

11  examination by Dr. Degner and this was documented in plaintiff's

12  medication record. Exh. K to Rothermich Declr. at p. 20.

13  At this time, Dr. Degner did not order a neurology consult or

14  a CT scan, but instead, stuck with his diagnosis of tension

15  headaches. Degner Depo. at pp. 61, 77-79; Exh. K to Rothermich

16  Declr. at p. 8.

17  On May 24, 2007, Dr. Daryl Ruthven, SMU psychiatrist, saw

18  plaintiff to evaluate his complaints of severe headache. Exh. K to

19  Rothermich Declr. at p. 83. He noted plaintiff's complaints and

20  symptoms and while he thought the most likely cause was

21  psychosomatic in origin, there were also signs this may not be

22  accurate because there was no particular identified precipitating

23  stressor, no indication of malingering, and his pain appeared quite

24  real and severe. Id. Dr. Ruthven ordered Vicodin and a CT scan.

25  Id.

26  Plaintiff received the CT scan on May 29, 2007. Id. at p. 9.

27  The scan showed that plaintiff had an immense subdural hematoma.

28  Id. at p. 19; Olson Declr. at ¶ 19; Ruthven Depo. at p. 76.

18 - FINDINGS & RECOMMENDATION

1    Plaintiff underwent emergency brain surgery that same day.  Exh. K
2    to Rothermich Declr. at pp. 21-22.

3        Plaintiff remained hospitalized until June 4, 2007, when he
4    was transferred to the infirmary at OSP.  Id. at p. 9.  From the
5    date of his surgery until at least June 18, 2007, plaintiff was on
6    anti-nausea, anti-vertigo, and pain medication, and his cognitive
7    functioning was limited.  Pltf Declr. at ¶¶ 27-28.  He also
8    suffered from dizziness and blurred vision, rendering reading and
9    writing difficult.  Id. at ¶ 28; Exh. K to Rothermich Declr. at pp.
10   9-13.

11                              STANDARDS

12       Summary judgment is appropriate if there is no genuine issue
13   of material fact and the moving party is entitled to judgment as a
14   matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the
15   initial responsibility of informing the court of the basis of its
16   motion, and identifying those portions of "'pleadings, depositions,
17   answers to interrogatories, and admissions on file, together with
18   the affidavits, if any,' which it believes demonstrate the absence
19   of a genuine issue of material fact."  Celotex Corp. v. Catrett,
20   477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

21       "If the moving party meets its initial burden of showing 'the
22   absence of a material and triable issue of fact,' 'the burden then
23   moves to the opposing party, who must present significant probative
24   evidence tending to support its claim or defense.'"  Intel Corp. v.
25   Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991)
26   (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th
27   Cir. 1987)).  The nonmoving party must go beyond the pleadings and
28   designate facts showing an issue for trial.  Celotex, 477 U.S. at

19 - FINDINGS & RECOMMENDATION

322-23.

The substantive law governing a claim determines whether a fact is material. T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party. Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. T.W. Elec. Serv., 809 F.2d at 630-31.

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Id.; In re Agricultural Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990); California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

DISCUSSION

Defendants move for summary judgment on both claims. In their opening memorandum, defendants argued that plaintiff failed to exhaust his administrative remedies as to both the failure to protect and medical claims. In their reply memorandum, defendants dropped the exhaustion argument regarding the failure to protect claim. Defts' Reply Mem. at p. 10. Defendants confirmed this at oral argument. At the end of oral argument, defendants also conceded the exhaustion argument regarding the medical claim. Thus, remaining for resolution are defendants' qualified immunity arguments on both claims.

/ / /

20 - FINDINGS & RECOMMENDATION

I.  Qualified Immunity Generally

        An official is entitled to summary judgment on the ground of qualified immunity where his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Until recently, courts considering an official claim of qualified immunity followed the two-step protocol established in Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), which required us first to determine whether the defendant violated a constitutional right and then to determine whether that right was clearly established. See Pearson v. Callahan, ---- U.S. ----, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009) (overturning Saucier in part). In Pearson v. Callahan, the Supreme Court reversed this earlier rule and gave courts discretion to grant qualified immunity on the basis of the "clearly established" prong alone, without deciding in the first instance whether any right had been violated. Id. Thus, we may grant qualified immunity if "the facts that a plaintiff has alleged or shown [do not] make out a violation of a constitutional right" or if "the right at issue was [not] 'clearly established' at the time of defendant's alleged misconduct." Id. at 816, 818 (internal citations omitted).

James v. Rowlands, 606 F.3d 646, 650-51 (9th Cir. 2010).

    In their reply memorandum, defendants concede that "the rights in this case were likely sufficiently clearly established," Defts' Reply Mem. at p. 4, but they contend that they are entitled to qualified immunity because their conduct did not violate plaintiff's rights.  In analyzing whether the conduct at issue violated plaintiff's rights, the court "determine[s] whether, taken in the light most favorable to [Plaintiffs], Defendants' conduct amounted to a constitutional violation[.]" Bull v. City & County of San Francisco, 595 F.3d 964, 971 (9th Cir. 2010) (internal quotation omitted).

II.  Failure to Protect Claim

    To succeed on an Eighth Amendment claim for failure to protect

21 - FINDINGS & RECOMMENDATION

1  an inmate from violence, the inmate must show that he was

2  incarcerated under conditions posing a "substantial risk of serious

3  harm" and that a prison official displayed deliberate indifference

4  to inmate health or safety.  See Farmer v. Brennan, 511 U.S. 825,

5  834 (1994).  The inmate must first "make an objective showing that

6  the deprivation was 'sufficiently serious' to form the basis for an

7  Eighth Amendment violation."  Hearns v. Terhune, 413 F.3d 1036,

8  1042 (9th Cir. 2005).  Second, the inmate "must make a subjective

9  showing that the prison official acted with a sufficiently culpable

10 state of mind."  Id.

11     In their opening memorandum, defendants concede that because

12 plaintiff was actually assaulted, he will "likely establish the

13 objective component."  Defts' Mem. at p. 14.  Thus, at issue is

14 whether defendants acted with deliberate indifference in addressing

15 the threat to plaintiff.  Id.

16     As explained in Farmer, to establish the subjective component

17 of deliberate indifference, plaintiff must show that "the official

18 knows of and disregards an excessive risk to inmate health or

19 safety; the official must both be aware of facts from which the

20 inference could be drawn that a substantial risk of serious harm

21 exists, and he must also draw the inference."  Farmer, 511 U.S. at

22 837.  However, "an Eighth Amendment claimant need not show that a

23 prison official acted or failed to act believing that harm actually

24 would befall an inmate; it is enough that the official acted or

25 failed to act despite his knowledge of a substantial risk of

26 serious harm."  Id. at 842.

27     Defendants argue that prison officials did not ignore any

28 perceived threats to plaintiff but instead, exercised their best

22 - FINDINGS & RECOMMENDATION

judgment regarding how to handle the situation in a way they believed would ensure plaintiff's safety. The point to several facts in the record to support their argument:

(1) plaintiff told prison officials several times that everything was "ok," that he "did not feel threatened," and that "things had cooled down";

(2) when prison officials were notified of the situation, they conducted an investigation into the threats being made against plaintiff, Borello and Ogden met with plaintiff, and officials concluded that inmates were not taking active measures to harm plaintiff and the best thing to do was let the incident "blow over";

(3) when plaintiff notified prison officials of additional threats and that the incident had not "blown over," defendants took action against Steiner by "shaking down" the shop where Steiner and plaintiff worked;

(4) Steiner was found guilty of possessing contraband; and

(5) after the second assault, prison officials transferred plaintiff to a different facility.

Defendants also suggest that there is no evidence that they were aware of anything more than vague, generalized threats. They had no information about the time of the assault, the location of the assault, or even the identity of the assailant. Additionally, defendants note that plaintiff's own testimony is that he did not want to be transferred or placed in "lock up." Defendants argue that based on these facts, although plaintiff was assaulted twice, the evidence shows that prison officials acted reasonably and in a manner they believed would ensure plaintiff's safety.

23 - FINDINGS & RECOMMENDATION

1    Plaintiff contends that the record suggests that defendants
2    not only had the requisite subjective knowledge, but they
3    purposefully created the threat.  According to plaintiff, the fact
4    that defendants themselves created the threat, along with the
5    absence of a timely response, demonstrates that defendants'
6    actions, or lack thereof, were not reasonable, or at the very least
7    creates an issue of reasonableness that must be presented to a
8    jury.

9    I agree with plaintiff that the evidence creates a triable
10   issue for the jury.  First, the evidence raises an issue of fact as
11   to whether Kowanda told Steiner that plaintiff was the rat.
12   Although in his deposition Kowanda denied that Schaefer ever told
13   him that plaintiff and Jones were the source of information about
14   the game disk, Schaefer said that he told Kowanda where he got the
15   information and he expressly testified that he told Kowanda that
16   plaintiff and Jones had "visited with me." Additionally, plaintiff
17   witnessed Kowanda taking Steiner aside for the first of two private
18   conversations soon after plaintiff informed Schaefer about the
19   video game.  Borello's final report states that such a conversation
20   took place, even though Kowanda would not confirm it during
21   deposition.   Borello's report also indicated that Steiner had
22   assisted Kowanda with previous investigations so they were familiar
23   with each other.   Then, Steiner told plaintiff that "staff" had
24   told him that plaintiff was the "rat."

25   Viewing this collective evidence in a light favorable to
26   plaintiff, a reasonable juror could conclude that Kowanda told
27   Steiner that plaintiff was the informant regarding the video game.
28   This in turn could support a determination that defendants acted

24 - FINDINGS & RECOMMENDATION

with deliberate disregard for plaintiff's safety.  See Solis v. County of Los Angeles, 514 F.3d 946, 957 (9th Cir. 2008) (given the "relative credibility of the witnesses," and despite prison official's testimony to the contrary, a reasonable jury could have found that prison official was aware of inmate's ex-gang member status and nonetheless "gave [him] up" and thus, prison official acted with deliberate indifference in transferring him to the gang module); Reagan v. Meisel, No. C-99-5748, 2004 WL 3019317, at *3 (E.D. Pa. Dec. 28, 2004) (when prison official knew that inmate had cooperated with government against a co-defendant, had been transferred to a different prison because the cooperation presented a risk to the inmate's safety, that co-defendant had communicated threats to inmate through other prisoners and knew that the inmate had been transferred back to the first prison, facts sufficient to support both a finding that inmate was incarcerated under conditions posing a substantial risk of serious harm and an inference that prison official was actually aware of an objectively intolerable risk to Reagan's safety).

Additionally, one of the defendants testified in deposition that if Kowanda told Steiner that plaintiff was the source of the allegations about the video game, such an action violates ODOC internal protocols because it places an inmate's safety in jeopardy.  Troy Browser Depo. at pp. 20-22 (noting that general procedure is to keep information regarding complaining/reporting inmate confidential to protect safety of reporting inmate).  And, despite the plan agreed to be plaintiff, Ogden, and Borello to keep plaintiff safe by, inter alia, eliminating ODOC staff conversations with other inmates regarding the video game investigation, Tupou

25 - FINDINGS & RECOMMENDATION

1   and Willis nonetheless met with Steiner and warned him that he

2   would be moved if he were implicated in misconduct.  A reasonable

3   juror could view this confrontation as a deliberate compromise of

4   plaintiff's safety.

5       While defendants correctly suggest that the Eighth Amendment

6   failure to protect standard is not violated by a "mere suspicion

7   that an attack will occur[,]" State Bank of St. Charles v. Camic,

8   712 F.2d 1140, 1146 (7th Cir. 1983), Farmer makes clear that a

9   prison official may not "escape liability for deliberate

10  indifference by showing that, while he was aware of an obvious,

11  substantial risk to inmate safety, he did not know that the

12  complainant was especially likely to be assaulted by the specific

13  prisoner who eventually committed the assault."  511 U.S. at 843;

14  see also Brown v. Budz, 398 F.3d 904, 915 (7th Cir. 2005) ("It is

15  well settled that deliberate indifference may be found though the

16  specific identity of the ultimate assailant is not known in advance

17  of assault.").

18      The record is capable of showing that officials were aware of

19  facts from which the inference could be drawn that a substantial

20  risk of harm existed, and that they also drew that inference.  The

21  facts create more than "mere suspicion," because plaintiff

22  identified a particular individual who was likely to threaten him,

23  or be the cause of any harm, and Kowanda, under plaintiff's version

24  of the facts, actually exposed plaintiff to Steiner as the source

25  of the report of the video game.  Despite an agreement to the

26  contrary, Tupou and Willis spoke to Steiner even though Tupou

27  acknowledges talking to Ogden about the potential problem created

28  by Steiner seeing plaintiff as a "rat."  Tupou Depo. at p. 42.

26 - FINDINGS & RECOMMENDATION

As <u>Farmer</u> recognizes, however, a reasonable response by prison officials to the threat can negate liability.   511 U.S. at 845. Defendants argue that even assuming they had actual knowledge of a sufficiently substantial risk to plaintiff's safety, they are not liable because they responded reasonably to any risk that did exist.   In support of this argument, defendants rely on several of the facts cited above:    (1) they investigated the risk to plaintiff; (2) they discussed the risk to plaintiff and plaintiff's fears with plaintiff on many occasions; (3) Ogden, Borello, and plaintiff agreed to a "safety plan"; (4) they took action against Steiner by "shaking down" the shop where plaintiff and Steiner worked, resulting in a contraband possession charge against Steiner; (5) they met with plaintiff again after the first assault; (6) they suggested transferring plaintiff to another prison but plaintiff refused; (7) they suggested putting plaintiff in a "lock up" which plaintiff refused; and (8) after the second assault, they transferred plaintiff.

Defendants argue that these actions show they acted reasonably and in a manner they believed would ensure plaintiff's safety and thus, they cannot be liable under the Eighth Amendment for a failure to protect plaintiff from harm.

I agree with plaintiff that the evidence, when viewed in a light favorable to plaintiff, creates an issue of fact regarding the reasonableness of defendants' response.   In addition to the facts cited by defendants, the record contains three emails sent by Schaefer regarding plaintiff's safety, one of which was sent two days before the first June 11, 2006 assault.   In that email, dated June 9, 2006, Schaefer wrote to Willis that plaintiff had told him

27 - FINDINGS & RECOMMENDATION

1  that Steiner threatened plaintiff that day.  Exh. M to Rothermich

2  Declr.  At the end of the email, Schaefer expressly suggested the

3  "immediate shipping of Steiner before he can contact his friends

4  and plan a strategy against Inmate Padget [sic]."  Id.

5      The second email, sent June 13, 2006, two days after the first

6  assault, was sent to Kolman and stated:

7          I understand there were verbal threats against inmate
           Padget [sic] yesterday morning on the shop floor.  I am
8          concerned because you did not inform me of the incident
           or give me detailed explanation of the event, nor
9          apparently did you take any action when the event
           occurred.  I heard information of the event initially
10         from inmate Padget [sic] much later.  Events that have
           transpired could become volatile and need to be dealt
11         with immediately.

12 Exh. N to Rothermich Declr.

13      Finally, the third, written after the second assault, was sent

14 to Willis and stated:

15         FYI - Vincent Padget [sic] got attacked again yesterday
           bad enough that he stayed home today.  Inmate Steiner got
16         only a 7 day [loss of privileges for the possession of
           tobacco contraband].  It is unfortunate Steiner has not
17         been shipped that perhaps could have avoided all this
           action from his "little helpers."  Is there anything we
18         can do?  I don't want to loose [sic] Padget.  He has done
           more for the shop in marketing assistance than Aasted and
19         all others combined.

20 Exh. Q to Rothermich Declr.

21      As plaintiff notes, the emails show that at least one of the

22 defendants (Schaefer) did not believe that OSCI was doing enough to

23 protect plaintiff.  And, drawing all inferences in plaintiff's

24 favor, the emails could be construed to show that defendants knew

25 Steiner was planning to have plaintiff assaulted, did not do all

26 they could to protect plaintiff, and had they actually transferred

27 Steiner out of OSCI sooner, harm to plaintiff could have been

28 avoided.

28 - FINDINGS & RECOMMENDATION

1    Other facts, referred to above, show that on June 9, 2006,
2  Steiner confronted plaintiff and threatened him with assault,
3  telling him that prison staff had identified plaintiff as the rat.
4  Plaintiff immediately informed prison staff of the threat and
5  drafted a memo describing it.  The next day, Steiner was found in
6  possession of contraband and issued a citation.  The day after
7  that, plaintiff was assaulted in the recreation yard.  After
8  learning that Steiner took credit for the assault, plaintiff wrote
9  a kyte and a memo to prison officials on June 11 and June 12, 2006.
10 He continued to receive multiple threats from Steiner's friends
11 throughout the month.  On July 5, 2006, Steiner was found guilty of
12 possessing contraband after a hearing.  Plaintiff was assaulted the
13 same day.

14    Plaintiff argues that while Ogden and Borello's plan, which he
15 concedes he agreed to, may not have been unreasonable on June 1,
16 2006 when the three of them had their meeting, the fact that this
17 was defendants' only response to the threat and the only effort to
18 address plaintiff's safety is unreasonable in light of the
19 escalating threats that began on June 9, 2006, and continued until
20 the second assault on July 5, 2006.  I agree with plaintiff that a
21 reasonable juror could conclude that punishing Steiner for a
22 separate infraction after "shaking down" the shop is not equivalent
23 to preventing that inmate from doing harm to others.  Furthermore,
24 as the timing of the events shows, citing Steiner for possessing
25 tobacco at a time when defendants knew that Steiner blamed
26 plaintiff for being a "rat" about the video game, with no
27 restrictions on Steiner's housing or communications, possibly
28 heightened Steiner's desire to cause plaintiff harm.  The fact that

29 - FINDINGS & RECOMMENDATION

1  plaintiff was first assaulted two days after Steiner was cited, and
2  then again on the same day Steiner received his punishment, shows
3  that Steiner was capable of swiftly retaliating against plaintiff.

4      Additionally, a reasonable juror could conclude that
5  defendants' unwillingness to initially transfer plaintiff from OSCI
6  in the face of plaintiff's express desire to stay at OSCI, was not
7  reasonable.  Defendants themselves admit that they do not make
8  transfers based on inmate preferences, as demonstrated by their
9  transfer of plaintiff after the second assault when he still
10 maintained that he wanted to remain at OSCI.  Browser Depo. at p.
11 22; Tupou Depo. at p. 60; Ogden Depo. at pp. 38-39, 99.

12     And, while plaintiff's express desire to stay could be viewed
13 as an indication that plaintiff did not view the threat that
14 seriously, a contrary, but equally persuasive inference is
15 supported by evidence that plaintiff explained that he was
16 concerned that transferring him would make things worse because it
17 would confirm that he was a rat who was "running."  He also
18 explained that he wanted to stay at OSCI because he liked his job
19 there.

20     Finally, transferring or segregating plaintiff were not
21 defendants' only options.  For example, there is no explanation in
22 the record why defendants did not follow Schaefer's June 9, 2006
23 suggestion that Steiner be transferred.

24     Viewing the record as a whole, and construing the evidence in
25 plaintiff's favor, there are issues of fact regarding the
26 reasonableness of defendants' response to the threat posed by
27 Steiner.  Accordingly, defendants fail to show, on summary
28 judgment, that their conduct did not violate plaintiff's rights.

30 - FINDINGS & RECOMMENDATION

1   As a result, they are not entitled to qualified immunity and their

2   motion for summary judgment on the failure to protect claim should

3   be denied.

4   III.  Medical Claim

5           To sustain his Eighth Amendment medical care claim, plaintiff

6   must show "'deliberate indifference to serious medical needs.'"

7   Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting

8   Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  As the Jett court

9   explained,

10          [i]n the Ninth Circuit, the test for deliberate
            indifference consists of two parts. . . . First, the
11          plaintiff must show a serious medical need by
            demonstrating that failure to treat a prisoner's
12          condition could result in further significant injury or
            the unnecessary and wanton infliction of pain. . . .
13          Second, the plaintiff must show the defendant's response
            to the need was deliberately indifferent. . . . . This
14          second prong-defendant's response to the need was
            deliberately indifferent-is satisfied by showing (a) a
15          purposeful act or failure to respond to a prisoner's pain
            or possible medical need and (b) harm caused by the
16          indifference. . . . Indifference may appear when prison
            officials deny, delay or intentionally interfere with
17          medical treatment, or it may be shown by the way in which
            prison physicians provide medical care. . . . Yet, an
18          inadvertent or negligent failure to provide adequate
            medical care alone does not state a claim under § 1983.
19
    Id. (citations, internal quotations, and brackets omitted).
20
            As indicated, mere negligence is insufficient for liability.
21
    Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).  And, a
22
    difference of opinion does not establish deliberate indifference.
23
    Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).
24
            Defendants admit that the objective prong of the inquiry has
25
    been met because the subdural hematoma is a serious medical
26
    condition.  Defts' Mem. at p. 9.  However, they contend that
27
    plaintiff fails to establish that they acted with deliberate
28

    31 - FINDINGS & RECOMMENDATION

1  indifference.

2      Defendants note that plaintiff does not complain that he did
3  not receive care, but that he did not receive the care he thought
4  was adequate. But, according to defendants, there were no material
5  findings indicating a sufficient justification for a CT scan, or
6  other imaging, prior to May of 2007.

7      Defendants recite the following facts they consider relevant
8  to their argument: in July 2006, when plaintiff was assaulted the
9  second time, he was treated at the OSCI infirmary and then taken to
10 the hospital where he was treated. There is no mention in the
11 chart at that time of a headache or loss of consciousness or other
12 changes to suggest an intracranial bleed.[1] In September 2006,
13 plaintiff's headaches were specifically noted for the first time.
14 In response, plaintiff was evaluated and given anti-inflammatory
15 medication. From November 2006 through April and into May 2007,
16 subjective complaints of headache were documented and defendants
17 suggest, plaintiff's needs were not ignored. Plaintiff received
18 cursory neurological examinations showing no evidence of any
19 material findings consistent with a subdural hematoma. They
20 contend that it was not until plaintiff began vomiting that his

---

22      [1] While the parties, and this Court, have tended to view
23 plaintiff's two claims as entirely separate from one another, I
24 cannot help but notice that the medical records from the date of
25 the second assault were created by medical staff at OSCI who
26 worked with the very defendants at OSCI alleged to have failed to
27 prevent the assaults.

32 - FINDINGS & RECOMMENDATION

prior symptoms changed in any significant way, indicating a more serious condition.

Defendants point to four May 2007 examinations. The first, May 8, 2007, included a cursory neurological exam by Dr. Degner, a general practitioner, which showed no significant findings suggestive of a subdural hematoma of significance. Additionally, at this exam, defendants point out that there "was no objective sign of discomfort" noted in the record without identifying what an objective sign of discomfort is. The chart from the second examination on May 20, 1007, noted a chronic-to-mild headache with medication not effective in controlling the subjective complaints. The chart note from the third examination on May 22, 2007, noted that plaintiff's pain was so severe that it was causing him to facially grimace and subject him to emotional breakdown. Fourth, defendants cite to the May 29, 2007 CT scan.

Defendants argue that the decision whether to order a CT scan, like the decision to order an x-ray, is a "classic example of medical judgment" and decisions not to order such diagnostic studies do not amount to deliberate indifference. At most, defendants contend, plaintiff makes out a claim for medical malpractice which is insufficient to sustain an Eighth Amendment claim.

Defendants' position ignores relevant and material evidence in the record and fails to acknowledge readily apparent reasonable inferences which at a minimum raise questions of fact about defendants' actions which must be resolved by a jury, and at worst, strongly suggest the presence of deliberate indifference, or

In addition to the facts recited in the "Background" section

33 - FINDINGS & RECOMMENDATION

1   above, the record shows that from early October 2006 through July

2   2007, Dr. Degner was the treating primary care physician for SMU

3   inmates' medical care.  Degner Depo. at pp. 28-29.  He visited the

4   SMU weekly, and examined the patients the nurses had set up for him

5   to see.  <u>Id.</u> at p. 58.  He also reviewed the medical progress or

6   chart notes of the inmates and discussed symptoms with the SMU

7   nurses.  Barbara Deardorff Depo. at pp. 20, 23-24, 26-27.

8       SMU nurse Barbara Deardorff indicates that when plaintiff was

9   complaining of continued headaches, the SMU nurses were concerned

10  that plaintiff was not getting relief from the medications that Dr.

11  Degner was prescribing.  Deardorff Depo. at pp. 37-38.  The nurses

12  brainstormed about what could be done and at one point, concluded

13  that plaintiff should have a CT scan.  <u>Id.</u> at p. 38.  Although

14  Deardorff was no longer Dr. Degner's nurse at the time, she was

15  "taking steps" to make sure that other nurses talked to Dr. Degner

16  to suggest a CT.  <u>Id.</u> at p. 39.  When plaintiff's headaches became

17  even more severe, Deardorff and other nurses discussed getting a

18  second opinion from another OSP physician regarding plaintiff.  <u>Id.</u>

19  Deardorff called a person named Ted Randall who suggested that he

20  could arrange for Dr. Vargo to see plaintiff.  <u>Id.</u>  This was before

21  plaintiff began experiencing dizziness and vomiting.  <u>Id.</u>

22      Deardorff herself referred plaintiff for a physician's

23  evaluation on May 6, May 13, and May 20, 2007.  <u>Id.</u> at p. 56.  As

24  indicated above, chart notes show that plaintiff was seen by Dr.

25  Degner on May 8, and May 22, 2007.  Thus, while plaintiff was seen

26  fairly promptly after the May 6 and May 20, 2007 referrals, there

27  is no indication he was seen after the May 13, 2007 referral.

28      In his deposition, Dr. Degner testified that the reason there

34 - FINDINGS & RECOMMENDATION

1  are no chart notes by him between May 8 and May 22, 2007, despite
2  Deardorff's May 13, 2006 request for physician evaluation for
3  plaintiff is probably because he did not see actually plaintiff in
4  the interim between May 8 and May 22, 2007.  Id.  He does not
5  recall declining to see plaintiff.  Id.

6      Plaintiff states that from November 7, 2006, to May 22, 2007,
7  Dr. Degner repeatedly refused to examine plaintiff for his
8  continuing headaches even when SMU nurses signed him up for
9  treatment.  In his deposition testimony, plaintiff states that he
10 complained to the infirmary on October 26 or 27, 2006, of headache
11 pain and a nurse named Jaime Cook gave him Tylenol, ibuprofen, or
12 ketoprofen, and a wet cloth to put over his eyes, and put him on
13 the sign up list for the doctor.  Pltf's Depo. at p. 30.  He saw
14 the doctor the next Tuesday, and was told that his problems were
15 stress.  Id.  Plaintiff reacted angrily, and screamed and yelled.
16 Id.  Plaintiff concedes he was not appropriate with the doctor.
17 Id. at pp. 30-31.  Then, he explains, Cook signed him up to see the
18 doctor again, but the doctor came and saw everybody but him.  Id.
19 at p. 31.  Plaintiff states that this "went on," and when he asked
20 Cook why the doctor would not see him, Cook responded that he did
21 not know, the doctor was not talking to Cook, and was not going to
22 tell Cook.  Id.

23     Plaintiff's OSP medical record shows that a request for
24 plaintiff to be seen by a doctor was entered into his chart on
25 October 29, 2006, and November 1, 2006, and that he was seen on
26 November 7, 2006.  Exh. K to Rothermich Declr. at p. 3.  Then,
27 there was a physician visit request made on November 13, 2006, and
28 another on November 19, 2006.  Id. at pp. 4, 42.  The November 19,

35 - FINDINGS & RECOMMENDATION

1  2006 chart note states that plaintiff was scheduled for the doctor

2  "this week." Id.  However, he was not seen by a physician until

3  January 9, 2007, after a January 4, 2007 chart note indicating that

4  plaintiff was complaining of chronic headache pain. Id.

5      Another request for a physician visit was made on March 9,

6  2007. Id. at p. 77. As with the November 19, 2006 note, this one

7  also says he was placed on the list for "this week." Id.  However,

8  plaintiff was not seen until a couple of weeks later, on March 20,

9  2007. Id. at p. 5.

10     A reasonable juror could rely on this evidence to conclude

11 that Dr. Degner purposefully refused to see plaintiff despite being

12 requested to do so. Additionally, Deardorff's testimony is capable

13 of suggesting that Dr. Degner was ignoring plaintiff's repeated

14 complaints that the medications prescribed by Dr. Degner were

15 ineffective. Her testimony could also suggest to a reasonable

16 juror that Dr. Degner was deliberately refusing to order a CT scan.

17 If the SMU nurses concluded even before plaintiff began

18 experiencing dizziness and vomiting that a CT scan was indicated,

19 a reasonable juror could surmise that Dr. Degner likely should have

20 come to that conclusion as well and the fact that he did not order

21 the diagnostic test could be evidence of negligence. Coupled with

22 the other evidence of failing to see plaintiff for examinations,

23 the failure to order the CT scan earlier could raise a question of

24 deliberately ignoring plaintiff's needs.

25     Both defendants and plaintiff present declarations of expert

26 witnesses, and defendants rely on declarations from Dr. Degner and

27 Dr. Ruthven as well. Dr. Degner states that the medical record

28 from Salem Hospital following plaintiff's July 5, 2006 assault,

36 - FINDINGS & RECOMMENDATION

reveals that plaintiff denied loss of consciousness. Degner Declr. at ¶ 3.[2] Dr. Degner also notes that on July 9, 2006, plaintiff was evaluated by prison medical staff for his headache, and had a normal exam. Id.

On October 27, 2006, Dr. Degner reports, plaintiff was admitted to the SMU and diagnosed by Dr. Duran with Axis III headaches. Id. at ¶ 4. On or about November 7, 2006, Dr. Degner states he evaluated plaintiff and determined that plaintiff's headache symptoms presented as "pretty classical muscle tension headaches." Id. at ¶ 5.

Dr. Degner explains that none of his examinations revealed any focal neurological findings that plaintiff was suffering from anything more than common tension headaches. Id. at ¶ 6. For example, plaintiff's neck was not stiff, he had normal body movement functioning, normal appearance, normal walking, and no obvious signs of pain or discomfort. Id. Dr. Degner states that additionally, plaintiff seemed to respond to non-steroid treatment, consistent with treatment for stress headaches. Id. Dr. Degner concludes by noting that on May 24, 2007, plaintiff's symptoms were

---

[2] The hospital records show that plaintiff was seen at Santiam Memorial Hospital, not Salem Hospital. Exh. L to Rothermich Declr. Moreover, the hospital record does not show that plaintiff denied losing consciousness. As previously explained, the record makes no mention one way or the other whether plaintiff lost consciousness or did not lose consciousness. It is completely silent on the matter.

37 - FINDINGS & RECOMMENDATION

1  significantly different with the inability to hold food down and

2  facial grimacing.  <u>Id.</u>

3       Dr. Ruthven's declaration provides information similar to Dr.

4  Degner's declaration except that Dr. Ruthven adds that the types of

5  headaches plaintiff complained of were consistent with the kinds of

6  headaches seen with ongoing mood disorders, which plaintiff had

7  been diagnosed with.  Ruthven Declr. at ¶¶ 3, 7.  He states that

8  because  medical  had  evaluated  plaintiff,  had  given  him  a

9  neurological exam with no focal findings, there was no particular

10 indication that plaintiff needed a head CT or MRI, or a separate

11 neurological examination.  <u>Id.</u>

12      Defendants' expert is Dr. Donald Olson, a neurosurgeon.  <u>See</u>

13 Attchmt 1 to Eidson Declr. at p. 2 (Olson curriculum vitae showing

14 residency in neurological surgery July 1965 to December 1969).

15 After  summarizing  what  Dr.  Olson  found  to  be  the  significant

16 information from plaintiff's chart notes, Dr. Olson states:

> In a private practice situation, it is likely if any
> patient repeatedly comes with the same complaint, to seek
> out a specific objective diagnosis ruling out worst case
> scenario.  In a private practice situation, this is done
> more common than not to want to avoid life-threatening
> situations  such  as  an  acute  subdural  hematoma.    The
> presence of a chronic subdural hematoma can be present
> from  months  to  years  without  causing  material  brain
> damage if the shifting is done slowly as appears to be
> the case for this particular patient.  Should the patient
> have  been  referred  to  a  neurologist  or  neurosurgeon
> sometime after November of 2006?  It is likely that they
> would have ordered a CT scan because, obviously, they
> were being asked to see on a consultation basis, but in
> the case of this patient not having been referred to a
> specific specialist and showing no signs of objective
> change and/or measurable neurological impairment, the
> conclusion has to favor the physician as having done an
> appropriate and correct examination.  That premise being
> accepted, argument might be made for ordering a CT scan
> earlier than May of 2007, possibly in April, but the
> noted progress notes stating that the headache went away
> is certainly sufficient argument to carefully observe and

38 - FINDINGS & RECOMMENDATION

watch the patient at that point for developing
neurological findings. . . . .

In my view then, the argument regarding when a CT scan
should have been ordered, anywhere between the time of
March to May would have been appropriate. I do not think
that ordering it earlier would have made any difference.
I do not think that there was any hard evidence to make
it imperative to order the exam in March rather than May.

Attchmt 2 to Eidson Declr. at p. 3.

Olson's separately filed declaration is consistent with his
expert narrative.

In response, plaintiff submits the declaration of Dr. Timothy
J. Roddy, a board certified internal medicine physician in private
practice since 1987 in the Portland area. Roddy Declr. at ¶ 1.
Dr. Roddy states he has reviewed the medical and mental health
records of plaintiff as produced by the ODOC to plaintiff's
counsel, and also reviewed transcripts of the depositions of
plaintiff, Dr. Duran, Deardorff, Dr. Degner, and Dr. Ruthven. Id.
at ¶ 2.

Dr. Roddy initially summarizes the medical record and then
notes that plaintiff's headache history was remarkable in that he
had not been a headache sufferer prior to his assaults, his
headaches were severe, debilitating, and progressive, and most
importantly, they developed after head trauma. Id. at ¶ 8. Dr.
Roddy notes that the records show that plaintiff had only partial
and temporary relief from medication prescribed for common tension
headaches. Id.

Dr. Roddy states that it is with reasonable medical
probability that plaintiff's headaches were the result of his
chronic subdural hematoma. Id. at ¶ 9. At the time the CT scan
was conducted on May 29, 2009, it indicated that plaintiff had a

39 - FINDINGS & RECOMMENDATION

significant midline shift, showing that there was significant
pressure on his brain at the time of his diagnosis.  _Id._  If
plaintiff's CT scan had been performed earlier, his treatment, and
thus his pain, would have been alleviated much sooner.  _Id._

Dr. Roddy opines that the standard of medical care was not met
in this case and it would have been obvious to any reasonable
community physician in the Salem, Oregon area to consider a
traumatic brain injury much sooner than May 2007.  _Id._ at ¶ 10.
Dr. Roddy continues:

> 11.  Indeed, given Mr. Padgett's complaints of
> severe headaches for several weeks, the fact that he had
> no history of prior headaches, and his reports that the
> headaches were caused by head trauma, it would have been
> obvious to any reasonable physician as of Dr. Degner's
> examination of Mr. Padgett on November 7, 2006, that a
> head CT scan or referral to a neurologist was the next
> appropriate step in the medical evaluation of Mr.
> Padgett's headaches.
>
> . . .
>
> 13.  It is medically unacceptable to have failed to
> order [a] head CT scan or a neurology referral for a
> patient without a prior history of headaches who develops
> persistent and severe headaches after head trauma.
>
> 14.  The records suggest that Dr. Degner appeared to
> have a preconceived notion that the patient was
> malingering.  He did not seem to take the patient's
> complaints seriously.  He did not formulate a broad
> differential diagnosis, or consider other treatment or
> diagnostic options even when the patient developed
> secondary vomiting from progressive headaches.  Under
> these circumstances, his failure to order a head CT scan
> or neurology consult is not acceptable medical care, and
> posed a substantial risk to Mr. Padgett's health.  In
> particular, Dr. Degner's continued failure to order a CT
> scan or neurology referral even after Mr. Padgett began
> vomiting from the headaches and could not stand was a
> dramatic departure from acceptable professional judgment.
>
> 15.  The absence of any focal neurological symptoms
> during Dr. Degner's cursory examinations of plaintiff did
> not rule out the possibility that Mr. Padgett's headaches
> were caused by a subdural hematoma or other brain injury.

40 - FINDINGS & RECOMMENDATION

1  Roddy Declr.

2      Notably, both Dr. Olson and Dr. Roddy indicate that plaintiff
3  should have had a CT scan as early as November 2006. Thus, a
4  reasonable juror could conclude that the record supports an
5  inference that Dr. Degner's failure to order a CT scan at that time
6  was malpractice.

7      Plaintiff concedes that if this instance of malpractice were
8  the "sum total" of Dr. Degner's treatment of plaintiff, it would
9  not allow a jury to infer deliberate indifference. But, plaintiff
10 points to the evidence previously discussed demonstrating that Dr.
11 Degner deliberately refused to examine plaintiff. And,
12 importantly, plaintiff argues that the evidence that Dr. Degner
13 persisted in the same ineffective course of treatment for seven
14 months, despite Dr. Degner's awareness of plaintiff's constant
15 complaints and eventually, his dramatically worsening symptoms, is
16 evidence a reasonable factfinder could conclude amounts to
17 deliberate indifference.

18     I agree. As noted above, a reasonable juror could conclude
19 that Dr. Degner refused to examine plaintiff for his ongoing
20 headache complaints, even when the SMU nurses put plaintiff on the
21 list for a visit. The evidence shows that the SMU nurses were
22 concerned about the lack of treatment by Dr. Degner such that they
23 concluded a CT scan should be ordered and attempted to arrange for
24 a second opinion for plaintiff from another OSP physician. There
25 is also deposition testimony from Dr. Duran that could be
26 interpreted to show that Dr. Degner believed prisoners had
27 malingering tendencies causing him to disbelieve inmate complaints
28 of pain. See Duran Depo. at p. 79 (stating that Dr. Degner thought

41 - FINDINGS & RECOMMENDATION

1  that prisoners could be challenging to treat in terms of figuring
2  out what was medical versus what was malingering).

3      The most alarming evidence on the issue, and which
4  overwhelmingly supports an inference of deliberate indifference, is
5  Dr. Degner's treatment, or lack thereof, of plaintiff in May 2007.

6      Plaintiff's complaints of pain escalated in May 2007.
7  Although Dr. Degner noted plaintiff's report of being in a great
8  deal of pain on May 8, 2007, he repeated his diagnosis of a tension
9  headache.  On May 13, 2007, plaintiff began rating his pain as a
10 "10" on a "0 to 10" scale.  Notably, Dr. Duran, <u>not</u> Dr. Degner,
11 ordered a different medication, Midrin, for plaintiff.  On May 16,
12 2007, plaintiff began vomiting because of the pain and reported
13 obtaining only moderate relief from Midrin.  Again, notably, Dr.
14 Duran, <u>not</u> Dr. Degner, ordered a neurology consult, which never
15 occurred.  Plaintiff repeated complaints of severe pain on May 18,
16 2007, and May 20, 2007.  He vomited every time he stood up on May
17 21, 2007.  He was crying, had facial grimacing, and a flushed face.
18 Staff called Dr. Degner who ordered an injection of Toradol, which
19 effected no change in plaintiff's symptoms.

20     Astonishingly, when Dr. Degner examined plaintiff in his cell
21 on May 22, 2007, because plaintiff was too ill to leave his cell,
22 and during which plaintiff vomited several times, Dr. Degner <u>still</u>
23 did not order a CT scan.  Instead, according to plaintiff, he told
24 plaintiff that the symptoms were caused by plaintiff's abusing his
25 psychiatric medication, even though plaintiff told Dr. Degner he
26 had stopped taking it.  Had Dr. Degner reviewed plaintiff's
27 records, he would have known that plaintiff had stopped taking that
28 medication several days earlier.  Incredulously, Dr. Degner

42 - FINDINGS & RECOMMENDATION

1  remained convinced that plaintiff suffered from tension headaches.

2  It was not until <u>two days later</u>, on May 24, 2007, that Dr. Ruthven,

3  <u>not Dr. Degner</u>, ordered a CT scan.  Finally, five days after that,

4  on May 29, 2007, plaintiff learned he had a subdural hematoma and

5  underwent emergency surgery.

6      These facts are more than sufficient to allow a reasonable

7  juror to conclude that Dr. Degner intentionally and without

8  reasonable explanation denied care that he knew was necessary and

9  stood in the way of a diagnostic procedure that plaintiff needed.

10 Thus, a reasonable juror could conclude that Dr. Degner was

11 deliberately indifferent to plaintiff's serious medical needs.  <u>See</u>

12 <u>Greeno v. Daley</u>, 414 F.3d 645, 653-54 (7th Cir. 2005) (noting that

13 to prevail on an Eighth Amendment claim, prisoner need not show

14 that he was ignored; evidence showing the "medical defendants'

15 obdurate refusal" to alter prisoner's course of treatment despite

16 his repeated reports that the medication was not working and his

17 condition was getting worse could support conclusion that the

18 treatment received was "so blatantly inappropriate as to amount to

19 intentional mistreatment").

20     Because plaintiff creates issues of fact as to whether

21 defendants' conduct violated plaintiff's constitutional rights,

22 defendants are not entitled to qualified immunity.  I recommend

23 that the motion on the medical needs claim be denied.

24                          CONCLUSION

25     I recommend that defendants' motion for summary judgment (#91)

26 be denied.

27                       SCHEDULING ORDER

28     The Findings and Recommendation will be referred to a district

43 - FINDINGS & RECOMMENDATION

1  judge.  Objections, if any, are due August 30, 2010.  If no

2  objections are filed, then the Findings and Recommendation will go

3  under advisement on that date.

4  / / /

5  / / /

6      If objections are filed, then a response is due September 16,

7  2010.  When the response is due or filed, whichever date is

8  earlier, the Findings and Recommendation will go under advisement.

9      IT IS SO ORDERED.

10              Dated this 12th  day of August, 2010.

11

12                          /s/ Dennis J. Hubel

13  _____

14                          Dennis James Hubel
                            United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

44 - FINDINGS & RECOMMENDATION